```
               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK



----------------------------X
                            :
WINSOME MARTIN,             :
                            :      11-CV-1089 (NGG)(RLM)
              Plaintiff,    :
                            :      July 6, 2012
                            :
              V.            :      Brooklyn, New York
                            :
LUTHERAN AUGUSTANA CENTER,  :
et al.,                     :
              Defendant.    :
----------------------------X


   TRANSCRIPT OF CIVIL CAUSE FOR SETTLEMENT CONFERENCE
         BEFORE THE HONORABLE ROANNE L. MANN
            UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:        AMBROSE WOTORSON, ESQ.




For the Defendant:        DAVID GREENHAUS, ESQ.
                          RICHARD DORN, ESQ.

Audio Operator:


Court Transcriber:        ARIA SERVICES, INC.
                          c/o Elizabeth Barron
                          102 Sparrow Ridge Road
                          Carmel, NY 10512
                          (845) 260-1377



Proceedings recorded by electronic sound recording,
transcript produced by transcription service
```

```
 1              THE CLERK:  Civil cause for settlement

 2   conference, docket number 11-CV-1089, Martin v.

 3   Lutheran Augustana Center, et al.

 4              Counsel, please state your appearances for

 5   the record.

 6              MR. WOTORSON:  Good morning, your Honor.

 7   Ambrose Wotorson for the plaintiff, who is on her way.

 8              THE COURT:  Well, she's twenty minutes late

 9   already.

10              MR. DORN:  Richard Dorn, Levy Ratner, for

11   defendant 1199 SEIU.

12              MR. GREENHAUS:  David Greenhaus, Jackson

13   Lewis, for Lutheran Augustana Center.

14              MS. ALFREDO:  I'm Laura Alfredo (ui)

15   Lutheran Augustana.

16              THE COURT:  All right.  And, Mr. Dorn, your

17   client is?

18              MS. GUTHRIE:  Francine Guthrie, organizer

19   for 1199 SEIU.

20              THE COURT:  I'm sorry, I didn't get your

21   last name.

22              MS. GUTHRIE:  Guthrie.

23              MR. DORN:  G-u-t-h-r-i-e.

24              THE COURT:  All right, welcome to all of

25   you.  Please be seated.  This is on for a settlement
```

1    conference at the request of the district court, Judge

2    Garaufis.  Let me explain the procedures that I

3    typically follow in conducting settlement conferences,

4    and then I'll hear from you if you have any questions,

5    comments, objections or proposals for modifying those

6    procedures.

7            What I would like to do today is have a very

8    detailed discussion with all of you about the case and

9    the facts underlying this case.  Now that discovery is

10   completed, presumably, we'll be able to have meaningful

11   discussions, which we couldn't have before because very

12   little discovery had taken place.

13           What I will do is give each attorney an

14   opportunity or a series of opportunities to present

15   what you expect to be able to prove at trial and how

16   you're going to prove it.  I don't want to hear

17   conclusory assertions.  I know generally what the case

18   is about from -- both from the record and from prior

19   proceedings in the case.  But now that discovery has

20   ended, I want to hear specifics.  And where there are

21   factual disputes, I want you to acknowledge those

22   disputes and tell me why the version that you're

23   advocating is the more credible or reasonable one.

24           I'd ask you not to interrupt opposing

25   counsel.  I anticipate that you will be hearing things

1   that you disagree with but I ask you to please be

2   patient, and I will give you an opportunity to respond.

3   I don't want to have a free-for-all.

4           After I've heard from all counsel in this

5   joint setting, what I would then like to do is meet

6   with each group of parties privately and off the

7   record, with my promise to you that what you tell me in

8   the context of a private conference will remain

9   confidential, unless I have your express authorization

10  to disclose any particular aspect of our discussion.

11          Following the private conferences, we'll

12  reassemble as a group.  At that time, I'll tell you

13  what I believe is a fair and reasonable resolution of

14  the case.  Now, because we have two groups of

15  defendants in the case, I don't know at the outset

16  whether I'm going to recommend a global settlement that

17  would require that all three groups of parties accept

18  or whether, instead, I would recommend two bilateral

19  settlements with each of the two groups of defendants.

20  I want to get a better feel from the case, from hearing

21  from all of you, before I make that determination.

22          What I will then do after I make my

23  recommendation is -- what I would like to do is have

24  each attorney and client then meet with me privately

25  and respond in confidence as to whether that party

1  accepts or rejects.  After I've heard from all three

2  parties, I will then bring everyone back together and I

3  will tell you that we either have a settlement or we

4  don't have a settlement.

5          If there's no settlement, that's all that

6  I'm going to report.  I'm not going to provide the

7  breakdown.  So for example, if it's a global settlement

8  and I say there's no settlement, no party will know

9  whether it's because one, two or all three parties have

10  rejected.  Similarly, if I recommend two separate

11  settlements, one with each of the defendants, as to any

12  bilateral settlement proposal, if one party rejects,

13  that party will not know whether the other side has

14  accepted or rejected.

15          So those are the procedures that I would

16  propose following.  Do any of you have any questions

17  about them or any objections to them?  All right.

18          Mr. Wotorson, why don't I start with you?

19          MR. WOTORSON:  Yes, your Honor.  Before I

20  start, I'd like to -- the Court mentioned that it was

21  familiar with the record, and I wasn't sure if that

22  also included perhaps a review of the transcript of our

23  last appearance before Judge Garaufis, because there

24  was an important procedural matter that I raised with

25  the Court, which I think is an important backdrop for

1   our discussions today.

2           And that is, your Honor, we had raised with

3   Judge Garaufis --

4           THE COURT:  I don't think there is -- there

5   hasn't been a transcript prepared of that conference.

6           MR. WOTORSON:  Okay.

7           THE COURT:  So all I know is what's in the

8   docket entry.

9           MR. WOTORSON:  In that case, your Honor,

10  I'll be very brief as to the procedural issue.  There

11  is a procedural issue that we raised with Judge

12  Garaufis about amending the complaint and possibly

13  having to file a motion to amend the complaint.  Judge

14  Garaufis obviously did not grant or deny that, but we

15  did have an extended discussion initially as to whether

16  or not we could do this by stipulation.

17          There was some back and forth and it was

18  during the course of that back and forth that Judge

19  Garaufis at some point simply said, maybe you ought to

20  be talking about settlement, and I thought that was a

21  good idea.

22          Briefly, the amended complaint or the motion

23  to file an amended complaint will seek to add a new

24  cause of action for wrongful termination.  The

25  complaint as it stands now does not have a termination

1    component.  Ms. Winsome Martin was terminated after

2    this lawsuit was filed, and the complaint will --

3              THE COURT:  When was she terminated?

4              MR. WOTORSON:  What was your termination

5    date?

6              She was terminated on August 27 of 2011.

7    That was -- excuse me.  That termination was after our

8    March 2nd, 2011 filing.  The complaint is going to claim

9    under Section 296 of the New York State Human Rights

10   Law that that was retaliatory, and that's what I wanted

11   to bring to the Court's attention.

12             One of the things we will be arguing here

13   today also are the damages that flow from that.  We

14   also told Judge Garaufis, if he were to deny the motion

15   to amend, it is a separate set of facts that we can

16   bring a new lawsuit, but I'm not so sure judicial

17   timing would be served by doing that.  That when the

18   conversation broke down and we discussed settlement.

19             THE COURT:  Well, if she was terminated

20   almost a year ago and only a little over five months

21   after she filed the lawsuit, why was there no previous

22   attempt to amend the complaint?

23             MR. WOTORSON:  I think for a variety of

24   reasons.  A) We were in litigation, and B), we thought

25   this was merely a continuation.  In fact, this issue

1    came up when Mr. Dorn, I believe -- I think I mentioned

2    termination and Mr. Dorn very quickly argued, well, no,

3    this complaint doesn't sound in termination, though I

4    had raised the issue of termination even earlier than

5    that, I think privately with Mr. Dorn, I believe.  I

6    don't remember but I think I may have.

7              But at the time of the complaint, we view

8    the complaint as sounding in ongoing mistreatment,

9    because she was employed at the time, and we thought

10   that would just be a continuation of.  So the need to

11   actually amend the complaint certainly became more

12   pressing when we received the pre-motion letters from

13   both counsel.

14             THE COURT:  Well, if you're going to be

15   charging it as retaliation, then how can it just be a

16   continuation, since you're saying that the object that

17   it's retaliating against is the fact that you filed the

18   lawsuit, so that's hardly a continuation of what came

19   before.

20             MR. WOTORSON:  Yes, your Honor.  What I'm

21   saying is, my view of -- when we had the complaint, she

22   was still employed and there was ongoing mistreatment

23   as she was working there, including being forced to

24   treat with a mental healthcare professional.

25             It is not uncommon for there to be

1    complaints where there's a retaliation claim and it

2    merely relates back to what has been previously been

3    filed.  That's how I viewed it at the time.  But as I

4    said, at the appropriate time, if we have to file a

5    motion to amend, we will do so, and if we can't, there

6    will unfortunately have to be a separate lawsuit filed.

7    The statute of limitations under 296 is three years.

8              THE COURT:  Has she filed an EEO complaint?

9              MR. WOTORSON:  No.  No, we have not filed an

10   EEO complaint.  I haven't explored it entirely but

11   there's also a possibility that a retaliation claim

12   would also sound under The Rehabilitation Act, to make

13   sure we continue to have federal jurisdiction.  But

14   right now, my thought has primarily been centered under

15   296, which also has a three-year statute of

16   limitations.  The Rehabilitation Act I believe has a

17   two-year statute of limitations.

18             THE COURT:  All right.  I take it that's Ms.

19   Martin with you now?

20             MR. WOTORSON:  It is.

21             THE COURT:  Welcome.

22             All right, Mr. Wotorson, let me hear from

23   you.  What do you expect to be able to prove at trial

24   and how are you going to prove it?

25             MR. WOTORSON:  The complaint also talks

1   about Ms. Martin being mistreated by Angela Peza (ph)

2   because Angela Peza was a pervious supervisor.  We're

3   not going to be pursuing that claim.  Candidly, the

4   discovery that came up, I think it would be very, very

5   difficult to establish that.

6            But what we will be able to establish,

7   though, is there were a series of letters, series of

8   meetings, in which Ms. Martin was variously complaining

9   about harassment that she was receiving from Ms. Martin

10  (sic), and she would make the complaints --

11           THE COURT:  I'm sorry, who was writing

12  letters about --

13           MR. WOTORSON:  Ms. Martin, I'm sorry.

14           THE COURT:  You just said Ms. Martin was

15  complaining about being harassed by Ms. Martin.

16           MR. WOTORSON:  I'm sorry, I apologize, Ms.

17  Peza, Angela Peza, who was her supervisor.  There are a

18  few letters and, importantly, there are several

19  meetings that she had, both with the employer as well

20  as the union, complaining about her --

21           THE COURT:  I thought I just heard you say

22  you won't be pursuing the claims that she was

23  mistreated by Ms. Peza.

24           MR. WOTORSON:  Yes.  Your Honor, we will be

25  pursuing claims that as a result of complaining, there

1   was some retaliation, which I told you about before.

2   But more importantly, there's a lawsuit against the

3   union as well for failure to file any grievances,

4   appropriate grievances on her behalf, for basically the

5   failure of fair representation.

6              So she would complain to the union and, in

7   many instances, the union would tell her, amongst other

8   things, that they just don't believe her, that they're

9   not going to file any grievances and there wasn't going

10  to be anything.

11             THE COURT:  I thought there were grievances

12  filed.

13             MR. WOTORSON:  There were not grievances

14  that were filed for some of the -- the last set of

15  suspension, and certainly towards the end --

16             THE COURT:  I thought there was a grievance

17  filed and previously, you argued that they refused to

18  arbitrate for her, but not that they refused to file

19  the grievance.

20             MR. WOTORSON:  Your Honor may be correct,

21  I'm getting the terminology wrong.  What I'm talking

22  about is the final step in her complaint.  But because

23  -- our theory is, because there was no effort to

24  arbitrate it, Ms. Martin was sort of left extremely

25  vulnerable.

1          And the very, very last grievance that she

2    attempted to file resulted in the employer basically

3    saying, as a condition to your continued employment,

4    you have to treat with a mental healthcare

5    professional.  We are unaware of anyone else having to

6    do that.  There's an extensive union contract that

7    gives even private employees certain due process

8    rights.

9                THE COURT:  As I understand it, it was anger

10   management treatment.

11               MR. WOTORSON:  It was a little bit more than

12   anger management, which Ms. Martin will tell you about.

13   She actually had to meet with a mental healthcare

14   professional.  It wasn't a simple anger management

15   course.

16               THE COURT:  Well, presumably, if you're

17   going to get anger management treatment, it's going to

18   be by a professional.

19               MR. WOTORSON:  I don't know about that, your

20   Honor.  She was -- she actually met with a mental

21   healthcare professional.  You can --

22               THE COURT:  A psychologist?

23               MR. WOTORSON:  It was a psychologist.  And

24   in fact, when Ms. Martin went to attend or to visit the

25   psychologist, it was not a -- just a second, your

1    Honor.  It was not an anger management course.  It had

2    absolutely nothing to do with anger management.  Ms.

3    Martin will relate to you privately.  After that, we

4    also wrote a letter protesting that, as a result of

5    this, she was forced to treat with a mental healthcare

6    professional.

7              The relationship between Ms. Martin and her

8    supervisors and actually people she worked with got

9    even worse.  It became very hostile.  It was our

10   position that this resulted ultimately in her receiving

11   a termination letter in August of that year.

12   Currently, Ms. Martin is not working and she has not

13   worked, frankly, since her termination in August,

14   despite her best efforts.

15             The only type of employment that she has had

16   has been extremely part time, which has been to help

17   people prepare tax returns.  So the salary that she

18   previously received has been completely lost.  Her

19   salary was approximately -- within the region of

20   $30,000 annually, and she has not received any salary

21   since then.

22             THE COURT:  Can you at least put this in a

23   framework for me because I'm not following.  Since you

24   began by saying that you won't be pursuing the claims

25   that she was mistreated by Ms. Peza, I'm not following

1   what the legal theory is.

2          MR. WOTORSON:  What I meant to say was, the

3   theory before was that my client was mistreated by Ms.

4   Peza in retaliation for her having filed a previous

5   lawsuit.  Now, there are several problems with that

6   claim.  Not only would it have been somewhat stale

7   because the lawsuit was filed several years ago, but it

8   now turns out after we did discovery, that the lawsuit

9   did not name Ms. Peza, the lawsuit did not actually

10  claim some of the things that we have in our complaint.

11         So all that remains is that Ms. Peza was a

12  supervisor of the plaintiff.  It's our position that

13  Ms. Peza did mistreat the plaintiff, but we're not

14  going to pursue a claim that Ms. Peza mistreated the

15  plaintiff because of her prior lawsuit at another job.

16  That is not going to be --

17         THE COURT:  You actually -- at the

18  conference on June 14 $^{th}$ of last year, you specifically

19  said that the retaliation claim was not intended to

20  refer to the EEO complaint against the prior employer.

21  So it wasn't my impression that that was your theory.

22         MR. WOTORSON:  I don't understand, your

23  Honor.

24         THE COURT:  I think I asked --

25         MR. WOTORSON:  The lawsuit -- she filed a

1    lawsuit.

2              THE COURT:  Against the prior employer.

3              MR. WOTORSON:  Correct.  She filed a

4    lawsuit.

5              THE COURT:  Right.  But when I asked whether

6    the retaliation was by the then current employer -- was

7    for the discrimination charges against the previous

8    employer, you said no.

9              MR. WOTORSON:  No, and that is correct.  We

10   were -- the prior lawsuit was against another employer.

11   It was our theory at the time that Ms. Peza had worked

12   for that previous employer.

13             THE COURT:  I understand, because I have

14   read the defense lawyers' letters to Judge Garaufis and

15   I was a little surprised when they were assuming that

16   the retaliation intended to refer to the prior

17   employment situation.  But in any event, you're not --

18   are you saying you're not pursuing the retaliation

19   claim that's alleged in the complaint?

20             MR. WOTORSON:  Correct.  I don't think -- I

21   don't think we have a basis, after discovery.  It's

22   clear that Ms. Peza -- through the depositions, that

23   Ms. Peza was not named in a prior complaint.  Frankly,

24   I think we have a serious staleness problem, so that is

25   not being pursued.

1      THE COURT:  But you are saying that she was

2  mistreated by Ms. Peza?

3      MR. WOTORSON:  Correct.  And it's our

4  contention that Ms. Martin made timely complaints to

5  both her employer and her union about that

6  mistreatment, and that the union, in our estimation,

7  completely dropped the ball, ultimately resulting in

8  her having to treat with a mental healthcare

9  professional and her being terminated after we filed

10  the lawsuit.

11      THE COURT:  But what was -- the allegation

12  was that Ms. Peza mistreated her on account of what?

13      MR. WOTORSON:  On account of her prior

14  protected activity at the prior job that Ms. Peza was

15  also a supervisor of Ms. Martin.  Now, we're -- we've

16  always in the position to sort of cut out that, and we

17  still have a freestanding harassment claim.  Luckily,

18  in these type of --

19      THE COURT:  Well, you don't have a

20  freestanding harassment claim against the hospital.

21      MR. WOTORSON:  Your Honor, she -- Ms. Peza

22  was employed by the hospital.

23      THE COURT:  Right.

24      MR. WOTORSON:  And these type of hybrid

25  actions are one of the few times -- one of the few

```
 1    areas where you can actually complain about what I will

 2    call, you know, vanilla harassment, meaning there's no

 3    discrimination claim or whatnot.  And here, the theory

 4    is, she complained both to her employer as well as her

 5    union about it.  And the nature of the harassment was

 6    such that it violated the terms of her contract.  She

 7    also had an opportunity to --

 8              THE COURT:  What in particular in her

 9    contract?

10              MR. WOTORSON:  There are -- there is a union

11    agreement that says she can only be terminated for good

12    cause shown, one.  And there is --

13              THE COURT:  Well, now you're arguing

14    termination, which may or may not be in the case.  So

15    let's talk about what's alleged in the complaint.

16              MR. WOTORSON:  The complaint -- the union

17    contract has a detailed due process procedure for

18    things such as demotions --

19              THE COURT:  Is there any claim she was

20    demoted?

21              MR. WOTORSON:  There's not a claim that she

22    was demoted but there is a claim, though, that as I

23    said before, that she was forced to treat with a mental

24    healthcare professional as a condition of her

25    employment.  And from our standpoint --
```

```
 1              THE COURT:  Is there something in the

 2    collective bargaining agreement or any -- is it the

 3    collective bargaining agreement that you say was

 4    violated?

 5              MR. WOTORSON:  Yes, yes.  And that part is a

 6    diminution of status.  It's not your traditional

 7    demotion.  But having to treat with a mental healthcare

 8    professional as a condition of your employment is a

 9    diminution of status.  No one else has to do that, she

10    had to do that, and that impacted her ability to

11    function, which she'll explain to you as she speaks

12    with you privately.  So that was our position as to how

13    the union contract certainly was violated.  And then as

14    I said before, she was terminated without cause.

15              THE COURT:  All right, let me hear from Mr.

16    Greenhaus first.

17              MR. GREENHAUS:  Yes, your Honor.

18              I'm not sure that I'm any closer to

19    understanding exactly what plaintiff is alleging

20    against Lutheran now than I was before.  We had this

21    discussion before Judge Garaufis.  And as I understood

22    it, plaintiff's counsel was essentially withdrawing the

23    claims that were alleged in the complaint for

24    retaliation as against Lutheran and, instead, was

25    offering up a new theory, one that he had about a year
```

1    to seek to amend to this complaint, that she was

2    retaliated against by Lutheran terminating her

3    employment in response to her filing this complaint.

4            We have a challenge in drafting a summary

5    judgment motion here because we're not quite sure what

6    the claims are.  And I think Judge Garaufis ordered, if

7    the case doesn't settle, plaintiff's counsel will file

8    a letter clarifying his claims.  But the way I'm

9    understanding this is, that's the only claim against

10   Lutheran right now.  This mistreatment claim against

11   Ms. Peza only relates in so far as the union failed to

12   respond to it.

13           So with respect to the termination claim,

14   the hospital doesn't really see a path to success for

15   the plaintiff here.  Number one, plaintiff has to move

16   to amend the complaint, basically.  He's had a year to

17   do that, hasn't done it.  I don't know whether we would

18   stipulate to that or not.  But assuming we didn't, the

19   Court frankly might not grant that motion at this

20   point, in which case, having withdrawn the claims

21   against Lutheran, he might have a claim under Section

22   296 but he would have to go refile that in state court,

23   where it would probably sit for a number of years.

24           Even if the Court was inclined to amend the

25   complaint, I don't know that the Court would allow the

1    amendment as to the union, because the claim against

2    the union for the termination is time barred.  The

3    termination occurred in August.  Section 301 has a six-

4    month statute.  So I don't know that the Court is

5    allowing that amendment as to the union.

6              And in that case, there's no federal

7    jurisdiction as against Lutheran.  The claim is only, I

8    think -- I know it's not under federal law.  I think

9    it's state and city law.  Judge Garaufis basically

10   said, if there's not federal jurisdiction, he's not

11   deciding this case.  And then plaintiff is back in

12   state court against, refiling this, where it will sit.

13             If the Court does grant the amendment, then

14   you asked what Lutheran would prove at trial, and it's

15   pretty simple.  Plaintiff was suspended in January for

16   insubordinate behavior.  That resulted -- that was the

17   result of --

18             THE COURT:  I'm sorry, remind me.  Was that

19   2011?

20             MR. GREENHAUS:  This is 2011, correct.  She

21   then went out on leave.

22             THE COURT:  Was that an incident involving

23   Ms. Peza?

24             MR. GREENHAUS:  No, no.  Ms. Peza, in fact,

25   to the extent it's relevant, had very little

1    interaction with the plaintiff.  She was, I think, a

2    second level supervisor.  Ultimately, she was the

3    director of nursing, I think.

4            MS. ALFREDO:  Associate director.

5            MR. GREENHAUS:  Associate director.  So she

6    did have some charge of responsibility but she was not

7    the direct supervisor and did not directly discipline

8    plaintiff on any occasion.  Occasionally, she signed a

9    discipline as a witness but she didn't administer the

10   discipline.

11           Plaintiff goes out on leave without

12   incident.  She goes out, she comes back.  And in

13   August, 2011 --

14           THE COURT:  The suspension was for how long?

15           MR. GREENHAUS:  It was for either two days

16   or four days.

17           THE COURT:  So when you say she went out on

18   leave, you're talking about the suspension --

19           MR. GREENHAUS:  No.

20           THE COURT:  -- or beyond the suspension?

21           MR. GREENHAUS:  Beyond the -- she comes back

22   and she's suffering from some sort of disability.  She

23   takes -- she goes out on a leave without incident.

24   It's unrelated to the anger management.  She goes out

25   on leave, she comes back.  And then in August, 2011 --

1   she's a CNA, by the way.  Lutheran Augustana is an

2   extended care facility.  She is charged with bringing a

3   resident to the Lutheran clinic for a medical

4   appointment.  I think it was an x-ray.

5          It was near the end of her shift.  I think

6   her shift ended at 3:00.  And at the end of her shift,

7   the medical procedure either wasn't completed or it was

8   completed but they still needed to finalize some

9   details.  So rather than stay with the resident, as

10   she's required to do, she left the facility, came back

11   to Lutheran Augustana, said, my shift is over, you need

12   to send someone else over there.

13          She admitted at deposition she did this.

14   This is a clear breach of Lutheran Augustana's rules

15   when it comes to caring for residents.  The resident I

16   don't think was -- I don't think the resident suffered

17   from dementia but had some sort of mental --

18          MS. ALFREDO:  Changes in mental status.

19          MR. GREENHAUS:  He wasn't sure where he was

20   all the time.  I don't think it was clinically

21   dementia.  But the rules of the facility clearly

22   require her to stay with that resident when you're off

23   premises.

24          Plaintiff testified that she told the

25   doctors and nurses at the clinic that she was leaving

1   but the doctors and nurses had other patients to tend

2   to and other jobs to do, and it's not their

3   responsibility to care for this resident.

4             Now, putting aside the various forms of

5   discipline that plaintiff received over the years,

6   putting aside the suspension that happened in January,

7   that in and of itself, leaving a resident over there,

8   is ground for termination.

9             THE COURT:  So the resident was where?

10            MR. GREENHAUS:  So Lutheran Augustana is,

11  like I said, an extended care facility.  I believe that

12  it's across the street -- I'll let Ms. Alfredo --

13            MS. ALFREDO:  Yes, your Honor.  Lutheran

14  Augustana is a nursing home, essentially.  Across the

15  street from Lutheran Augustana is Lutheran Medical

16  Center, which is a hospital.  It also operates clinics.

17  And within the four walls of the hospital is something

18  called a specialty clinic, where patients, including

19  residents of Augustana, on referral from Augustana,

20  come to get medical care.  So that's where Ms. Martin

21  was chaperoning this resident.

22            MR. GREENHAUS:  So she came back to Lutheran

23  Augustana -- she admits this -- and --

24            THE COURT:  She left the resident

25  unattended?

1          MR. GREENHAUS:  Correct, yes, in -- yes,

2    came back and then left for the day.  When this all

3    came to her supervisor's attention, there was an

4    investigation done.  And after investigating it,

5    Lutheran terminated her employment.  There's no

6    evidence in the record that the termination was for any

7    reason other than a legitimate business reason, the

8    failure to properly care for the resident.

9          So number one, we think this case is one

10    that, even if -- even if it includes a termination,

11    it's going to be disposed of on summary judgment based

12    on the facts, the undisputed facts in the record.  I

13    don't know that there's a disputed fact here.  And if

14    not, certainly at trial, all the witnesses will testify

15    to that.

16          By the way, if I may, because it's

17    important.  Plaintiff's counsel said that plaintiff

18    hasn't worked since she was fired.  At her deposition,

19    she testified that she was taking tax preparation

20    courses with, I think, Jackson Hewitt, and that she is

21    not looking for a job.

22          THE COURT:  Why don't you address the mental

23    health counseling issue, since that was focused on by

24    Mr. Wotorson.

25          MR. GREENHAUS:  As I understand that, that's

1   really more of a claim against the union.  I think that

2   -- defendant Lutheran did require plaintiff to undergo

3   anger management counseling.  She agreed to do it.

4   It's not the first time it's happened at Lutheran.  I

5   don't want to say it's routine but certainly it is --

6   it is the way Lutheran does business with employees who

7   have these issues.  They don't fire those employees,

8   they try to resolve the issue.

9              THE COURT:  I'm sorry, it was anger

10  management?

11             MR. GREENHAUS:  I believe it was anger -- I

12  believe it was anger management, yes.

13             MR. WOTORSON:  Member assistance program.

14  That's the official name.  Member assistance program.

15  At her deposition --

16             THE COURT:  All right.

17             MR. WOTORSON:  Sorry.

18             THE COURT:  I'll give you an opportunity to

19  respond after I hear from Mr. Dorn.

20             MR. DORN:  Your Honor, the claim in the

21  complaint basically alleges that the union breached its

22  duty of fair representation and that Lutheran violated

23  the contract, which I assume was the collective

24  bargaining agreement.  That's a hybrid, Section 301 DFR

25  complaint, under which the plaintiff has to prove both

1   that the union violated its duty of fair representation

2   and that the employer violated the collective

3   bargaining agreement.  I don't believe plaintiff can

4   prove either.

5            There is a six-month statute of limitations

6   for those kind of cases, and the only -- the sole

7   allegation in the complaint that is within the six-

8   month statute relates to that suspension, which

9   occurred in January of 2011.  At that time, the union

10  did file a grievance.  There was a grievance meeting,

11  at which Ms. Martin attended.

12           The union believes that it had convinced

13  management to reduce the penalty from four days to two

14  days.  And it is true that management wanted Ms. Martin

15  to attend what the union calls a behavior modification

16  session.  That was because Ms. Martin had claimed that

17  a number of supervisors had been following her around

18  and harassing her, and that a number of employees had

19  also been harassing her.  When the union organizer

20  asked Ms. Martin for the names of those employees so

21  that the union could convene a meeting to discuss the

22  situation, Ms. Martin refused to give the organizer the

23  names.

24           In any event, it is not true that this was a

25  unique situation involving a behavior modification.

1   There were at least three other employees at Lutheran

2   who had been made to attend such a program and there

3   are hundreds if not thousands over the years that have

4   been attending those programs throughout the union.

5          The union then asked Ms. Martin to let the

6   union know whether she was willing to attend that

7   program or whether she was not.  Ms. Martin never got

8   back to the union.  It appeared, after a while, that

9   Ms. Martin did attend at least one session, and she

10  went back to work.  The union never, never heard from

11  Ms. Martin again.

12         When the union learned that Ms. Martin had

13  been terminated in August, which was after the

14  complaint had been filed in March of that year, the

15  union sent Ms. Martin notification, asking her whether

16  she wanted the union to proceed to arbitration.  Ms.

17  Martin never got back to the union.

18         In any event, the union would certainly be

19  opposed to an amendment of the complaint against it

20  because, as I've indicated, the statute of limitations

21  for a duty of fair representation issue is six months

22  and this is a completely separate matter that cannot

23  relate back to the filing of the original complaint.

24  Therefore, as far as the union is concerned, there is

25  no basis for the complaint against the union.

1            MR. WOTORSON:  I'm sorry --

2            THE COURT:  All right.

3            MR. WOTORSON:  Let me go backwards.  As an

4     initial matter, Mr. Dorn may be correct.  We may be

5     time barred with respect to the union, and because it

6     is true that there is a six-month statute of

7     limitations.  I'm unsure at this point whether or not

8     relation doctrine that would apply.

9            However, your Honor, what you just heard

10    essentially was -- and I thank you, Mr. Dorn, for

11    laying it out a little differently from your colleague,

12    but he just told you that there were a series of

13    complaints that Ms. Martin had made about her

14    supervisors harassing her and following her.

15            We took the deposition of a human resources

16    person who is employed by the hospital, Ms. Widdige

17    (ph).  Ms. Widdige concedes and said the following in

18    her deposition:  She agreed that the hospital did

19    demand as a condition of her continued employment that

20    plaintiff participate in the member assistance program.

21    She said that the member assistance program is a mental

22    health program.

23            THE COURT:  I don't think that's disputed.

24            MR. WOTORSON:  I'd like to go a little

25    further here.  She further says that -- she testified

1    that she wanted her to speak with a mental healthcare

2    professional rather than her being fired, and this came

3    up because she had made these complaints.  According to

4    Widdige, she recommended that plaintiff treat with a

5    mental healthcare professional because she was angry

6    and distrustful.  She also said that -- and she said

7    she wanted to document plaintiff's mental health

8    issues.  This is from the human resources person.

9            She goes on to say that she really thought

10   plaintiff had treat with a mental healthcare

11   professional because plaintiff complained to her and

12   told her "several anecdotes demonstrating the

13   plaintiff's mental instability."  This is what happened

14   and you've not gotten the full story from the

15   defendants here.  This is Ms. Widdige's words, that it

16   was demonstrating mental instability.

17           Widdige herself said -- she said she found

18   no basis for -- apparently, there are some employees

19   who apparently said or suggested that the plaintiff was

20   mentally unstable.  Ms. Widdige said she herself saw no

21   evidence of the plaintiff being mental unstable.

22           The bottom line, your Honor, is it's our

23   theory that rather than the union do its job, the union

24   was part and parcel of allowing her to treat with a

25   mental healthcare professional, a psychiatrist, because

1    she was allegedly mentally unstable.  And this only

2    came up because she complained about her supervisors.

3    That's the case.  We may not have the type of

4    termination damages as against the union but if we get

5    to trial, that's going to be our position with respect

6    to the union.

7              THE COURT:  Well, you say she complained

8    about her supervisors.  You haven't responded to Mr.

9    Dorn's assertion that when she complained to the union

10   and the union said, who are these people that are

11   harassing you, she declined to give any names.

12             MR. WOTORSON:  Your Honor, I have not

13   responded to that because, frankly -- your Honor thinks

14   that's important and maybe it is.  I didn't think that

15   was important enough to say, you treat with a mental

16   healthcare professional.  If the plaintiff said, I'm

17   not trusting you right now, I'd like some assurances

18   because I don't want to be subjected to retaliation, I

19   don't think that's a sufficient basis for someone to

20   treat with a mental healthcare professional.

21             THE COURT:  Well, now you're -- now you're

22   putting words in your client's mouth.  Is that what she

23   testified to in deposition?

24             MR. WOTORSON:  She didn't testify to that

25   but I will say, your Honor, that I have a good faith

1   basis for saying what I just said.  I'm pretty sure she

2   did not testify to that.  But the larger point I'm

3   trying to make, your Honor, is I don't think -- if we

4   got past a motion for summary judgment, if we got to a

5   trial on this issue, I don't think the determining

6   factor would be whether or not the plaintiff failed to

7   give the names.

8           What's clear here and what both of these

9   attorneys have said is that this issue of her being

10  mental unstable and having to treat with a mental

11  healthcare professional arose out of her complaining

12  about being followed by supervisors and being harassed

13  by supervisors.  Ms. Widdige herself specifically said

14  my client made certain anecdotes that led her to

15  believe that she was mentally unstable.

16          THE COURT:  I thought -- I thought you said

17  that Ms. Widdige said she didn't -- she herself didn't

18  see any mental instability.  I'm a little confused now.

19          MR. WOTORSON:  Apparently, some employees

20  complained as well about her being mentally unstable,

21  and she, in her deposition -- whether it's

22  contradictory, this is her deposition.  In her

23  deposition, she says there were several anecdotes --

24  I'm sorry, there were several employees who gave

25  several anecdotes demonstrating plaintiff's mental

1    instability.  That's what she said.

2              And then she said she herself didn't see any

3    basis for the employees' conclusions but she still

4    demanded -- this is critical -- she still demanded that

5    as a condition of my client's employment, she treat

6    with a mental healthcare professional.  You know,

7    that's where the case may center around.  Again, we

8    think that we'll have a live retaliation termination

9    claim as to the employer.

10             Finally, Mr. Dorn also says that --

11             THE COURT:  What about the incident that,

12   according to Mr. Greenhaus, was the reason for her

13   termination?  Does she dispute that account of what

14   happened?

15             MR. WOTORSON:  She does dispute the account

16   and --

17             THE COURT:  What happened?

18             MR. WOTORSON:  Contrary to -- I will let Ms.

19   Martin speak with you about that.  Contrary to --

20             THE COURT:  I'd like -- I'd like it

21   addressed in the context of this -- you know, this

22   group setting.

23             MR. WOTORSON:  Your Honor, I'm prepared to

24   divulge only the following, except to say that she did

25   say that she did leave but she also testified at length

1    about informing other people who were responsible and

2    not just -- not just doctors.  I'm not so sure that it

3    would be sufficient to simply say that you informed the

4    doctors and the doctors are too busy.  There are other

5    -- that's what I thought.  There are other employees

6    who she informed as well, so it wasn't quite the

7    concession that the defendants had made out but there

8    was some --

9              THE COURT:  So she left the resident at the

10   hospital, unchaperoned --

11             MR. WOTORSON:  No.  Her --

12             THE COURT:  -- and returned to --

13             MR. WOTORSON:  Her position is she left the

14   resident supervised, not unchaperoned, as defendants --

15             THE COURT:  Supervised by whom?

16             MR. WOTORSON:  That's what she testified to.

17             THE COURT:  Supervised by whom?

18             MR. WOTORSON:  She testified that she spoke

19   with several doctors.

20             THE COURT:  At the hospital?

21             MR. WOTORSON:  And another -- and another

22   CNA.  Right.  And I believe she -- and at least one

23   other CNA who was responsible.

24             THE COURT:  Where was -- where were these

25   other people?

1          MR. WOTORSON:  The CNA was right there.

2          THE COURT:  With another resident?

3          MR. WOTORSON:  Yes.  It was right in the

4    same area -- in the same -- where the resident was, in

5    the same area where the resident was.

6          THE COURT:  But that other CNA was with

7    another resident.

8          MR. WOTORSON:  No, your Honor.  This

9    particular resident was not in the general population.

10   This particular resident was already segregated and

11   this CNA was -- I mean, this is all the same

12   department, but this particular resident was not in the

13   general population.

14          The CNA was -- I'm trying to think of a word

15   but was close enough to have purview over this person,

16   meaning she specifically spoke with the other CNA and

17   she also informed the doctors.

18          THE COURT:  Where was that CNA at the time?

19          MR. WOTORSON:  She just says -- yeah, your

20   Honor, she testified to at the deposition that there

21   was -- and she described the area.  There was a small

22   area where the scanning was.  It wasn't as if she

23   didn't --

24          THE COURT:  This was in the hospital?

25          MR. WOTORSON:  In the hospital.

1          THE COURT:  But why was the other CNA in the

2     hospital, because that's not -- that's not where

3     they're employment is generally located.

4          MR. WOTORSON:  The bottom line, your Honor,

5     is there is a disputed issue of fact here.  She agrees,

6     though, that she did leave.  Her position is that she

7     informed responsible people who were aware, at least

8     one CNA and there was also a nurse involved and I

9     believe at least one doctor.  That's what she testified

10    to, so that's it.  I mean, the defendants' version is

11    somewhat different from ours, and that will go to

12    whether or not there was a proper termination.

13         I also think it's still a disputed issue of

14    fact because there arises whether or not there's a

15    mixed motive, whether or not she really was, you know,

16    terminated for this or whether she was also terminated

17    in part because she had a pending lawsuit.  I don't

18    think that's something that's easily disposed of on a

19    summary judgment motion, especially given the fact that

20    we're talking about a comparatively short temporal

21    proximity, March/August.

22         But importantly, I wouldn't even argue the

23    traditional temporal proximity argument because the

24    lawsuit was still pending.  So every day, the time

25    frame between the protected activity and the

1  termination is extended because the lawsuit was

2  pending.

3          THE COURT:  All right.  Anything further?

4          MR. GREENHAUS:  The issues that Mr. Wotorson

5  discussed regarding what Ms. Widdige testified to --

6  plaintiff testified that she never complained to Ms.

7  Widdige about anything related to racial or sexual or

8  harassment related to a previous lawsuit.  Ms. Widdige

9  never testified that plaintiff came to her with racial

10  or sexual or any other sort of harassment.

11          THE COURT:  I don't think she's saying

12  otherwise now.

13          MR. GREENHAUS:  Okay.

14          THE COURT:  Nor is Mr. Wotorson.

15          MR. GREENHAUS:  Secondly, all those issues -

16  - those conversations with Ms. Widdige occurred prior

17  to the termination of employment, which again, it

18  appears that now this case is only about, as to

19  Lutheran, the termination of employment.

20          MR. WOTORSON:  No, your Honor, and I mean no

21  disrespect.  I respect counsel a lot and he knows, and

22  I've told him as much, but I do think now there is an

23  intentional effort to obfuscate the Court.  We just

24  heard from both counsel -- this was not something I

25  brought up first. They said that after she complained

```
 1   -- it was in the context of her complaining that the

 2   issue of her treating with a mental healthcare

 3   professional arose.

 4            THE COURT:  Why does the violation that you

 5   are alleging -- I understand she wasn't -- I won't even

 6   say I understand she wasn't happy because the

 7   allegation is that she agreed to it, but you're now

 8   saying that that was improper and that she was singled

 9   out, I don't know for what reason, since you're not

10   alleging discrimination.

11            MR. WOTORSON:  Your Honor --

12            THE COURT:  And I've heard that others were

13   also required to undergo mental health counseling.  So

14   tell me what is the wrong committed by the -- by

15   Lutheran with respect to -- what violation occurred,

16   whether your client thinks --

17            MR. WOTORSON:  Sending her -- sending her to

18   treatment requiring --

19            THE COURT:  What's the violation?

20            MR. WOTORSON:  -- requiring that she treat

21   with a mental healthcare professional as a condition of

22   her employment.

23            THE COURT:  What provision of the collective

24   bargaining agreement was violated?

25            MR. WOTORSON:  That was a diminution of
```

1   status, which is akin to a demotion.  She was

2   specifically told and Widdige testified that had she

3   not treated with a mental healthcare professional, she

4   would have been fired.  Again, this is critical --

5               THE COURT:  Was she told that at the time?

6               MR. WOTORSON:  Counsel said yes, but

7   importantly, Ms. Widdige testified about it at

8   deposition, that she was -- that she said that she said

9   that.  And I forget the date --

10              THE COURT:  But what's -- I understand -- I

11  will concede for purposes of our discussion today --

12  I'm not making a legal determination, but let's assume

13  that it is an adverse employment action, so that we

14  won't get -- but the question is, what makes it a

15  wrongful adverse employment action.  That's my

16  question.

17              MR. WOTORSON:  Sure, I gotcha.  It is only

18  wrongful in the context of the collective bargaining

19  agreement because --

20              THE COURT:  What -- and that's what I'm

21  trying to focus on.  What is the violation of the

22  collective bargaining agreement that you're alleging.

23              MR. WOTORSON:  And I said, there is a whole

24  due process requirement that has to be -- in other

25  words, if --

```
 1              THE COURT:  And how was the -- how was -- so
 2   you're saying it's a procedural violation.
 3              MR. WOTORSON:  Correct, which was --
 4              THE COURT:  What is the procedural
 5   violation?
 6              MR. WOTORSON:  There was no notice or
 7   opportunity to be heard with respect to her having to
 8   treat with a mental healthcare professional    .  She was
 9   simply told you either treat with the psychologist or
10   you're fired.  That's what happened, and I don't think
11   defendants are going to dispute that.
12              I just want to add, because I don't think
13   this is an issue but I just want to make sure we're all
14   on the same page.  I agree, had she specifically been
15   complaining about discrimination and she was sent to a
16   mental healthcare professional specifically because of
17   discrimination, we would have another cause of action.
18   I don't think that's what we have here.
19              We have here merely that she did complain
20   about being harassed.  She thought it was because of
21   her prior lawsuit.  The evidence doesn't really
22   establish that that's what was going on.  But
23   importantly, when she did complain, her complaints
24   essentially were met with, you're crazy, you go to a
25   mental healthcare professional as a condition of your
```

```
 1    continued employment.

 2                  Defendants started off by saying it was

 3    merely anger management.  That's not what it was.  Even

 4    Ms. Widdige didn't say it was simply anger management.

 5    And --

 6                  THE COURT:  Well, you seem to be

 7    distinguishing between anger management and

 8    psychological counseling.

 9                  MR. WOTORSON:  I am, I am.

10                  THE COURT:  Well, don't.

11                  MR. WOTORSON:  I understand --

12                  THE COURT:  So when I say anger management,

13    it doesn't mean that's to the exclusion of

14    psychological counseling.  Hopefully, the person who is

15    the treater for anger management is someone with

16    psychological expertise.

17                  MR. WOTORSON:  Your Honor, I completely

18    understand where you're coming from, but it's important

19    that I say this because -- from a settlement

20    perspective.  Again, if we happen to get past a motion

21    for summary judgment, it's my position, and I know that

22    your Honor was a trial attorney as well, but it's my

23    position that -- I don't think a jury would simply

24    assume that anger management and treating with a mental

25    healthcare professional are one and the same.
```

```
 1              I think jurors will recognize the

 2   distinction, especially in the context of Ms. Widdige

 3   saying there were other employees who gave anecdotes of

 4   her being mentally unstable.  She didn't see any

 5   evidence of the mental instability.  Those are the

 6   words she was using herself, but she was sent to go

 7   through with the mental healthcare professional.

 8              She also explained what the membership

 9   assistance program was.  She herself said it wasn't

10   just anger management.  It was a medical healthcare

11   program, essentially for people who are having mental

12   problems.  You could say, well, anger is a mental

13   problem.  I think a jury drawn from Kings County and

14   Nassau, Suffolk, wherever they come from in Eastern

15   District, I think they're going to be a little bit more

16   -- are going to see a little bit more into that.  I

17   don't think they're going to see the two as the same.

18              THE COURT:  Who do you think they're going

19   to see as being the treater for anger management?

20              MR. WOTORSON:  Judge, I think it's

21   irrelevant.  I think the word anger management vastly

22   downplays -- vastly downplays the fact that she was --

23   she was viewed as being a crazy person.  And because

24   she was viewed as being a crazy person, she was asked

25   to treat with a mental healthcare professional as a
```

1    condition of her employment.

2         I mean, the phrase anger -- if I were to say

3    it, I would say it was just anger management.  I think

4    anger management is different from saying -- treating

5    with a mental healthcare professional because we

6    thought she was crazy.  Anger management is you can't

7    control your anger sometimes, you know.  You might yell

8    at patients, you might -- I don't know, you might --

9         THE COURT:  Nobody said she was crazy.

10   People can have mental issues without being insane.

11        MR. WOTORSON:  It's a semantic argument but

12   it's important that I try to convince you.  I think the

13   phrase mental instability is perilously close to crazy,

14   versus -- you don't describe someone who has an anger

15   management issue as being mentally unstable, do you?

16   You don't.

17        THE COURT:  Unless you're thinking of

18   Charlie Sheen.

19        MR. WOTORSON:  I think it important that you

20   at least get the point I'm trying to make, so that's

21   where we are.

22        THE COURT:  I'm getting the point you're

23   trying to make.  I don't agree with you.

24        MR. WOTORSON:  I understand, Judge.

25        THE COURT:  All right, anything else?

1    Otherwise, I'll just meet with each group of parties

2    separately.

3              All right, so the one thing I haven't asked,

4    and I just want a yes or no:  Have there been any

5    settlement discussions?

6              MR. WOTORSON:  Very, very, very basic.  I

7    don't think --

8              THE COURT:  I mean, I would like to know

9    what those are but we have two individuals in the back

10   of the courtroom and I don't know who they are and what

11   their connection with this -- excuse me?

12             UNIDENTIFIED SPEAKER:  (Ui).

13             MR. GREENHAUS:  Related to plaintiff.

14             THE COURT:  To Ms. Martin?

15             UNIDENTIFIED SPEAKER:  Yes.

16             THE COURT:  All right.  So I assume there's

17   no objection if they're here, if we go off the record

18   and we talk about the settlement discussions, or would

19   we prefer to do that privately?

20             MR. GREENHAUS:  No objection.

21             MR. DORN:  Your Honor, I have no objection.

22   I don't believe there were any really serious

23   settlement discussions.

24             MR. WOTORSON:  I agree.

25             THE COURT:  Well, was there a demand?  And

1   if so, I'd like to go off the record to hear it, rather

2   than putting it on the record.

3             MR. WOTORSON:  I don't remember what the

4   demand -- but I do remember, I had -- even though they

5   were light, I had some -- I thought some fruitful

6   discussions with Mr. Dorn very early on in the

7   litigation, and there might have been a number

8   exchanged.  I don't remember.

9             THE COURT:  Why don't we go off the record.

10                      * * * * * * * * *

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          I certify that the foregoing is a correct

19   transcript from the electronic sound recording of the

20   proceedings in the above-entitled matter.

21

22

23

24

25   ELIZABETH BARRON                      August 10, 2012